Next case is McNeil-Pedale v. Johnson & Johnson McNeil-PPC v. Perrigo, 2007-15-08, Mr. Roper Does the discovery of a new property give you an entitlement to a patent on an old structure? You discover a new property of that structure or a new property of that place or whatever, but the structure is old, it's always been there. Because of that discovery of that new property or that new benefit, do you now have entitlement to a patent on that old structure? I think about your question, Your Honor. For example, we have a situation like adherency, I think the old case was titanium metals, where someone discovers a property, a new property of an old compound. It didn't resist corrosion and brine. Yes, and so you can't get a patent on that. But here we don't have that. Here the patent claims are on something new. In other words, it's not just some inherent property that's found. The actual invention here is new. So the invention here is a way of combining these two drugs in a very narrow and very specific way. The question is whether it was obvious. The question is whether it was obvious, exactly. But you had formaldehyde plus antacids, and you had coatings on cimetidine, and you had formaldehyde with a taste problem. I mean, all the stuff was there. A lot of things were there, Your Honor. Wasn't it very obvious? No, it was not, and for this reason. The prior art. Weren't you coating formaldehyde before? Formaldehyde had been coated before, and it's shown that way in the 114 patent, as one method, one possible method of taste masking formaldehyde. But this is different because here the prior art, Your Honor, had combined formaldehyde with antacids. That was in the Wolf reference and in the Davis reference. So they had combined the two. There was no bitterness problem. They used flavors and sweeteners in that combination. There was no bitterness problem. So the prior art and workers in this art, they had that prior art. There was simply no problem to be resolved. And if there's no problem to be resolved, there's no reason, and even KSR requires a reason, for making the modification that led to this invention. It seems to me to be, if you reduce that argument to its essentials, what you seem to be saying is if there is a problem and it can be solved in one of two ways, and it's known that it can be solved in one of two ways, and someone comes along and fully and amply solves it by way one, then somebody else then can get a patent on way two because it wouldn't have been obvious to try that because everybody ought to be satisfied with way one. I'm troubled by that logic underlying your argument. Well, the reason why that's not my argument, Judge Bryson, is that in this case it's not selecting one way or another way to achieve, and you're referring to taste masking results, it's not selecting one way or the other. Everybody agrees that these tablets always have flavors and sweeteners. They always do that for that purpose, for taste masking purposes. So if you've got flavors and sweeteners and they're working, there's no reason to go an additional step, to add an additional measure for doing it. It's not selecting between A and B. When you have A and B, is there any reason to do C? And here there's none. And, in fact, the district court... C, the coding for C, was in the prior art with respect to these, the H2 antagonists, these types of compounds. And so just mixing and matching, what's not obvious about that? Because the combination compounds that existed at Wolf and Davis were just fine and dandy as disclosed in those patents. There was simply no reason to do it. And I think what's really... If that combination, if the Wolf and Davis combination, had been proven by Parago to be bitter and to have required some further taste masking measure, okay, that would be one case. But now consider this. Parago has been working on this for a long time. They've been working with Fomodidine. They've been working with antacids. They've been working with flavors and sweeteners. Wouldn't it have been an easy thing for them to come in and prove that when you put Fomodidine together with antacid, together with flavors and sweeteners, you still have something bitter? It was their burden of proof, after all. Wouldn't that have been an easy thing to do? They couldn't prove it. Let me ask you this question. Let's take off the table, for purposes of a discussion, the whole degradation problem and the solution that the granular coating provided. If this were just a question about taste masking, and I want to make sure I understand the scope of your argument, would it be the case that this invention would be patentable, in your view, on the ground that the problem of taste masking was so clearly solved with sweeteners that our invention of another way of solving that problem, i.e., coating, even though coating had been used in the prior arc, would be patentable? I would kind of, if you don't mind, try to rephrase the question a little bit, if I'm wrong. If I'm not addressing it, please tell me. But, in other words, I would say that, even if you don't consider the unexpected properties, which is the way you started, is this prima facie obvious? And I say no, because... Are you saying that with a straight face? Yes, Your Honor, because there was no reason, no reason whatsoever, to change the formulations as had been outlined in Wolf and Davis. And consider this, that the only reason that the district court found a reason, the only route that he had to find a reason for making the modification was to rely on evidence that is clearly improper. He relied on the inventor's own post-invention documents. Now, I think, clearly, that's not correct. You can't rely on post-invention documents, and you shouldn't be relying on the inventor's own thought process. How does he justify it? He said, well, the inventor is a person of ordinary skill in the art. Well, that's wrong also. So, to answer your question, in other words, if he has to resort to that, to find the reason, and if they can't even come in and satisfy the burden with simply showing a reason, by showing it's better, there is no reason. So that's why I say, yes, there is no prima facie case. And I would make the other point, that with respect to the 933 patent, that's the alternative. He found this obvious for two approaches. One is, he said, you start with that Wolf and Davis thing, and you can take the teachings of 114, that's the coded granules thing, and come up with the invention. And he said, alternatively, you could use the 993 patent. But I just want to make the point, because I think it's important. If you use 993, you do not come up with coded granules, because these claims, as I said earlier, are narrow and specific. They require a two-step process, where first you make the granules of famadidine, having made the granules of famadidine, you coat the granules of famadidine. Two steps. No question about that. Claim five spells out the two-step process. The Markman ruling says it applies equally to the language-coded granules in claim one. So we've got no dispute on that. The 933 does not do that. It does not have that two-step process. Period. And so it simply doesn't meet the claims for that very reason. So, Your Honor, that's basically our appeal here. So we would ask you, because there's no prima facie case, I really think there's no prima facie case at all, we would ask you to reverse and revamp for other reasons. Or alternatively, if we consider the unexpected properties, which should have been considered, with respect to the unexpected properties, he relies on this statement, or he has a statement from KSR, that if a combination does no more than give predictable results, it can be obvious. Well, here, we obviously do have more. The more is solving the degradation problem. I'd like to save the rest of my time. We will do that, Mr. Roper. Thank you, Your Honor. Mr. Underwood. Good morning, Your Honor. So please, the Court. I'm pleased to represent Parago here this morning. My name is Stephen Underwood. We believe, Your Honor, that this is a very strong prima facie case of obviousness. Judge Pauley-Below got it exactly correct. The claims call for a code of familiarity granule in combination with it in acid. It's just that simple. He found that the prior art included the 114 patent, which taught a coded famotidine granule identical to that disclosed and claimed in the patent suit. He saw that that was the only reference that disclosed taste masking famotidine, and he saw that it disclosed exactly the same coded famotidine granule claimed in the patents in suit here. He found, through the testimony of any number of different witnesses, that famotidine was a bitter drug, and he found in the prior art, Wolf and Davis, that there were express teachings to combine famotidine with an antacid. But even if you're right, wasn't there that Roche declaration that showed an unexpected property? He didn't overcome a prima facie case. Judge Pauley-Below-Seemed to have done it in the patent office. The patent office, you're right, Your Honor, but Judge Pauley-Below-Below considered that unexpected results. He heard testimony from Dr. Roche. He reviewed Dr. Roche's declaration. He heard testimony from the experts on the manner in which formulations like this are developed. Libraminolocmin was incorporated by reference. Was it expected that the combination of famotidine with antacids would result in degradation? If you were to follow the standard practices in the industry, Libraminolocmin, Your Honor, you would have undoubtedly uncovered that in your normal interaction studies that you would undertake in the ordinary course of such a development. And didn't the coding obviate that? The coding did obviate that, but that doesn't change the fact that the coding was already in existence, in practice, on exactly the same medicament, famotidine, for taste masking purposes. And the court, I might add, Dr. Roche, he is a person having ordinary skill in the art because he is the inventor of the 114 patent as well. He is the person who developed that technology and he stands in a dual role here, both as a person having skill in the art and as an inventor. And looking at his comments where he said we were going to use the technology of the 114 patent, and I might add, Your Honors, when you see in their brief papers the reference to the chewable AC product, think the 114 patent technology because that's exactly what's at issue there. We know that because McNeill themselves identified the 114 patent in their orange book as covering the single ingredient famotidine chewable tablet. So Dr. Roche himself, when he was first assigned to this project of combining to a single tablet famotidine in an acid, he himself said we were going to use the coded famotidine granule of the 114 patent anyway. So he knew, he anticipated the taste masking need, he knew and he anticipated the bitterness of famotidine, and he knew and anticipated that the solution was the use of exactly the same technology as the 114 patent. Should that be held against them? Every inventor who has an idea thinks, Aha, this might work. That doesn't make it obvious. What it does is that it tells us what a person having ordinary skill in the art should do. We're charged under Graham v. John Deere with looking at the prior art, finding out what the differences are between the prior art and the claimed invention, determining what the level of ordinary skill in the art is, and then applying those facts to this case. In this case, Your Honors, if you look at the 114 patent, the only difference between the disclosure of the 114 patent and the claims at issue in this case is the presence or absence of an antacid. Given the teachings of Davis and Wolf, which disclosed specifically the combination of famotidine with an antacid, what could be more obvious than to combine those to reach the claimed invention here? That's what we're talking about here. Does adding an antacid to famotidine make it less bitter or not bitter at all? Judge Pauly looked at the evidence on famotidine. He said in footnote number seven of his opinion that it was his view that the famotidine needed to be taste-masked with a coating. That's expressly in one of his factual findings. What I'm asking is whether the antacid coating is sufficient to completely taste-mask or not. There's no evidence that it is at all. Whether or not it was interesting, I don't know that we do have the burden to have come forth with any tablets according to Davis or Wolf to make that point, Your Honor, which I think is what you're getting at. What he did find, however, is that famotidine has a very bitter taste. Keep in mind, the 114 patent does teach the use of additional flavorants and other ingredients in the tablet that can sometimes be used to overcome the bitter flavor of a drug. But he said, and that was only in the context of small children's medicaments, if you may recall, but Judge Pauly expressly stated, and you will not find this anywhere in any of the briefs of McNeil, that that is not the case here. That's a direct quote out of footnote seven. And so he examined that issue. He considered that issue and found that it wasn't sufficient. Moreover, if you look at the 114 patent, it teaches that the use of a coated famotidine granule can help the designer of these types of tablets to have less excipients, less flavorants in there, and thereby decrease the size of the tablet. So one is not to the exclusion of the other. The coated famotidine granule is expressly disclosed in the 114 patent as having advantageous application, even in the presence of various sort of bilateral combinations are disclosed. And so, accepting that there is a prima facie case, the problem I have is an affidavit. The examiner accepted comparison of the composition with a coating and without it and found unexpected advantages. And isn't that basic pharmaceutical practice? What he found supposedly in this declaration, Your Honor, and the judge made it clear in his opinion that he did not make a finding that that was true. He said it was disputed, but he accepted it for purposes of analyzing unexpected results. And I might add that, Your Honor, that the judge below did expressly consider unexpected results. We know that because he had a heading in his opinion called unexpected results and he had a page and a half of dialogue as to how he was analyzing that information. But what this declaration of Dr. Roach, all it did was identify another problem for which a previous problem had come up with the same solution. And as Judge Rader noted earlier on, what we have here is an old solution out there in the yard, obvious to anyone, and had somebody made a product like that, it would have been anticipatory. In other words, the obvious product didn't fail. That's correct. It couldn't fail. But the problem is that it's an obvious product. And under the law, again, to look at KSR, we're to look to a flexible and expensive standard. It was expected to have failed. In other words, was the lack of failure unexpected? Well, we would have never known had we followed the teachings of the 114 in combination with Wolf and Davis. It would have succeeded just as the prior art suggested it would succeed. There would have been no need to do any studies. There would have been no need to come up with any further solutions because that solution was already amply disclosed in the prior art. Again, I might note, Your Honor, for the record here, that the level of skill in this art is very high, in our opinion. It was stipulated that the person having ordinary skill would be, one, having a Ph.D. in chemistry, organic chemistry, pharmaceuticals or pharmaceutical microbiology, or an M.S. or B.S. with several years of work experience in pharmaceuticals, pharmaceutical microbiology, or an M.D. with several years of clinical experience. We're not talking about inventing maridine. No, we're talking about... Or any of the antacids. We're talking about combining old compounds. What could be more obvious than to take Wolf and Davis teaching the combination of famotidine with antacid and using the taste masking that was taught in the 114 patent because you already knew, as Judge Pauly found in prior art, that famotidine was bitter? Or what could be more obvious than taking the 114 patent, which is the only difference between it and the claimed invention, being the absence or presence of an antacid, and then looking to the Wolf and Davis and finding out that, ha-ha, that's taught there. Let's combine them. But would you be inclined, motivated, taught to do so if you didn't even recognize the problem that you need to solve? Which problem, Your Honor? We had a prior art problem. Of degradation. Yes, because you would have already been motivated by the problem of taste masking to employ the technology disclosed in the 114 patent. But why would you do that if you have perfectly available a less expensive and easier alternative? Just wrap it in antacid. Well, that's not been shown to be effective. And as I said, the 114 patent suggests that you might be able to... Well, you told me a minute ago you didn't know if it was effective or not. Well, that's true, but that also... So apparently the art was satisfied with that at the time, right? Well, there's no evidence that the art actually did that. There's no evidence that either in Wolf and Davis any of those combinations disclosed there were actually manufactured. It's been our view that throughout this case, for example, if you look in the Davis reference, Your Honor, when it talks about the tablet it refers to is tableted. The ingredients, all of these ingredients is tableted. It doesn't say were tableted. I mean, it becomes very clear. This from Wolf and Davis was a cementiting company, not a famotidine company. There's no evidence at all that any of these actual examples in Wolf or Davis were actually made. In Wolf, in fact, the antacid and the famotidine were administered concurrently. Actually, cementiting were administered concurrently, and there's no evidence that they were put together at any point in time. So there's no evidence that that doesn't, that that issue isn't met by the prior art. But I also want to make a note, Your Honor, that it is McNeil themselves in the admission that they made to the FDA, whereas in the complete product that corresponds to the patents ensued here, that they expressly admitted that they put the coating on the famotidine granule for taste masking purposes. And that's an admission. They said it to the FDA, that's a government agency, and we believe that that in addition to all of the other evidence suggests that this invention is imminently obvious. As to the alternative holding of the 933 patent, we believe Judge Pauly there as well got that right. You heard about the steps that wouldn't be necessarily followed, the granulation step and then the coating step. Well, what the 933 does is that it takes cementitine, takes eudregate, and effectively granulates and coats in the same step. And there's no reason why a person having ordinary skill in the art, realizing the interchangeability between cementitine and famotidine, wouldn't have opted for that technology. And this court has said in its prior precedent that unless there's a specific reason to hold steps in a particular sequence in a claim, that they can be combined or made out of phase. And we believe that in this case there's no reason why anybody wouldn't have considered the 933 relevant prior art in solving the alleged problem. Your Honors, I just want to conclude with the simple facts that the 114 patent is clear prior art, teaching everything in a claim, everything in a claim, except antacid. And Wolf and Davis supply that missing element. Under KSR and the flexible and expansive test, we believe that this court should affirm the lower court's finding of obviousness. Thank you. Thank you, Mr. Underwood. Thank you very much, and I'll try to be brief. First of all, let me say this. The argument that counsel is making is that one skill in the art would start with this 114 patent that teaches coded granules and would go on from there and add antacid to it. That argument was presented in the district court, and it was rejected. There is no analysis like that whatsoever in the district court's opinion. And the reason for that is that their expert admitted that one skill in the art would not go that way, would not start with coded granules. At page A323, Dr. Chalik, their expert, was asked a question. Now, in your opinion that you gave the court, you simply assumed that a formulator would start with coded granules and then would do something with that. Isn't that right? He said, no, I did not say that. So he renounced that view. He said one skill in the art wouldn't work that way. And then further on, on page A323, 1097, question, actually, I'd like to follow up on something you said. You did say that what a person would do is take the active ingredients, add flavorants and sweeteners, and would only go on to other means of taste masking, which is the thing we were discussing, Judge Bryson, would only go on to other measures if there was still a bitter taste. Didn't you say that? Yes, I did. So that's the expert. That's their expert talking about what people skilled in the art here would do. So you would not start with this 114 patent. Coming to the unexpected property idea, there's no testimony. In fact, I think I heard contradictory statements. There's certainly no evidence that you would find these things anyway. On the contrary, this was a difficult thing to find, this degradation issue. Paradox, even after they had our patent, they did tests and they couldn't find it. When they finally did find it in their own patent, in the Tevis patent, their patent, they acknowledge the significance of that discovery, the degradation discovery. They acknowledge it. It's at A1557, column 1, lines 51 through 53. They acknowledge the problem and they credit our inventor, Dr. Roach, with solving it. So that's not something insignificant that somebody is just going to come up with. It was difficult to find. It was very important, so important that they themselves credited Dr. Roach with finding it. Now, I heard Mr. Underwood say that you can treat the inventors as a person of ordinary skill in the art. Just as a matter of law, and I think the court did a great job of explaining that in Life Technologies, where it's quoting also Standard Oil, the court says, in effect, there's just something, call it what you will, that sets inventors apart from the person of hypothetical, of ordinary skill in the art. We just, as a matter of law, don't consider the inventor, because he's got the invention going on in his head, you don't consider him the person of ordinary skill in the art. So the judge was wrong in finding that and Mr. Underwood was wrong in saying it. All inventors have more than ordinary skill in the art? I think as a matter of law, it's not that you compare the credentials or the resumes of the two and see who's brighter. It's just that when the statute says a person of ordinary... But if the inventor gets lucky, doesn't even recognize he's invented it, but he's of ordinary skill in the art. That's right. So you can't consider that. I mean, you can't consider him the person of ordinary skill in the art if he's got that idea. If you did, all inventions would be obvious. We have, what, more than 100 or 200,000 people every year, more than ordinary skill in the art? I'm getting off the track. Go ahead. Well, what I'm saying is, I'm saying it's not a factual issue. It's a question, just as a matter of law, we exclude the inventor from being the person of ordinary skill in the art in this analysis. I want to add one thing, another thing also. Counsel referred to our product, the AC chewable product, which is the phlemonidine-only chewable product. That is not prior art. And the 114 patent does not have a tablet formulation of phlemonidine in it. And one other point with respect to the 933 patent, it's this. The point is that the claims, Claim 5 and by inference Claim 1, they require a two-step process. He said, well, you can do the same thing in one step. It doesn't matter whether you can do the same thing in one step. The fact of the testimony is you can't. Dr. Roach said, no, you can't. It won't work. But the legal point is that the claim requires two steps. It simply requires it. And so something that only has one step in it simply doesn't anticipate. And I think that concludes my argument. We have your argument, Mr. Roper. Thank you. Thank you, sir. I take it under advisement. All rise. The Honorable Court is adjourned from day to day.